

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00342-CR

_____

KEITH CORNELL HAYNES, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1495333

---

Before Sudderth, C.J.; Bassel and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

## I. Introduction

A jury found Appellant Keith Cornell Haynes guilty of capital murder by intentionally or knowingly causing the death of Kenishia Walker and Baby Walker by shooting Kenishia Walker (who was pregnant with Baby Walker[1]) with a firearm and by committing the two murders during the same criminal transaction. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A); *Lawrence v. State*, 240 S.W.3d 912, 914 (Tex. Crim. App. 2007). The State waived the death penalty, and the trial court sentenced Haynes to imprisonment for life without parole. *See* Tex. Penal Code Ann. § 12.31(a)(2).

On appeal, Haynes raises four issues:

(1) the evidence was insufficient to show that he was the person who murdered Walker and Baby Walker;

(2) the trial court erred by preventing him from effectively exercising his peremptory challenge to an alternate juror;

(3) the trial court abused its discretion by admitting State's Exhibit 117, a photograph of the entrance wound behind Walker's ear, because the photograph was too gruesome; and

(4) the trial court abused its discretion by admitting State's Exhibit 133, a photograph of Walker in her bloodied pajamas, because that photograph was also too gruesome.

---

[1]Although Baby Walker was not yet born, for purposes of the Texas Penal Code, he was an "individual": "'Individual' means a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth." Tex. Penal Code Ann. § 1.07(a)(26).

We hold that the evidence was sufficient to support Haynes's conviction, Haynes did not preserve any complaint regarding how the alternate jurors were selected, and the trial court did not abuse its discretion by admitting State's Exhibits 117 and 133. We overrule Haynes's four issues and affirm the trial court's judgment.

## II. Background

On the morning of Good Friday 2017, Walker's nearly nine-year-old son, Andrew,[2] went upstairs to her bedroom and found her uncharacteristically still in her bed. After trying to awaken his mother without success, Andrew pulled the covers back and saw a bloody hole in her head.

At first Andrew tried to find his mother's cell phone so that he could call the police, but it was gone. He then ran to his neighbor's townhome, relayed to her what he had seen, and told her that his mother was dead. The neighbor, Candace Howerton, called 911.

Officer Timothy Dillon, a first responder who investigated the scene, found a projectile under the pillow beneath Walker's head and a shell casing on the floor, but he did not find a weapon. The medical examiner determined that the cause of Walker's death was a gunshot wound to the head and that the manner of her death

---

[2]We use a pseudonym to protect the child's identity. *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

was homicide. The medical examiner further determined that the cause of Baby Walker's death was "intrauterine fetal demise due to maternal death."

On appeal, Haynes asserts that the evidence is insufficient to show that he was the person who shot and killed Walker and Baby Walker.

## III. Issues

We address Haynes's sufficiency complaint first. We then address his contention that the trial court erred in the manner that alternate jurors were selected. Lastly, we address Haynes's argument that the trial court abused its discretion by admitting two photographs over his Rule 403 objection that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. For the reasons given below, we overrule all of Haynes's issues.

### A. Sufficiency of the Evidence

In Haynes's first issue, he asserts that the evidence is insufficient to show that he was the person who shot Walker, killing both her and Baby Walker. Specifically, Haynes contends that the evidence does not clearly place him at Walker's residence at the time the shooting occurred. He also points out that the handgun used to kill Walker belonged to someone else, Jonathan Hill, and that Haynes's DNA was not found on the weapon. Thus, Haynes argues, the case against him was speculative.

#### 1. Standard of Review

In our evidentiary sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found

4

the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021).

## 2. Application

For the reasons given below, viewing the evidence in the light most favorable to the verdict, a rational factfinder could have found beyond a reasonable doubt that Haynes was the person who shot Walker and killed both Walker and Baby Walker.

The evidence showed that Haynes and Walker were in a relationship and that in December 2016, Walker informed Haynes that she was pregnant with his child. When Walker shared this news with others about a month later, she indicated to her friends that while she was excited about the baby, she did not want a relationship with Haynes.

Around the same time, Haynes sent texts to two different persons indicating his interest in buying a "burner" gun.[3] And a few weeks after that, in February 2017, Haynes used his cell phone to search for information about the effects of rat poison on someone who was pregnant and on whether rat poison could be fatal.

Two months later, in early April 2017, Haynes sent several text messages to Walker in which he expressed frustration with her. In the messages, Haynes indicated

---

[3]Haynes deleted text messages from his cell phone, and after the murders, the police were never able to locate Walker's cell phone. The State was nevertheless able to recover a number of text messages from (1) Haynes's cell phone, (2) Walker's service provider, and (3) the cell phone of Jolisa Lang, one of Walker's friends, who had received screen shots of text messages between Haynes and Walker, along with Walker's request for advice on how to respond.

a strong desire to raise the baby with Walker, but the desire was not reciprocated.[4] Other text messages between Haynes and Walker showed that the friction between them continued into the week preceding Easter Sunday. And on the days leading up to April 14, Good Friday, Haynes sent Walker a series of text messages indicating that he intended to visit her on the night of April 13.

Before arriving that evening, Haynes sent a text message to an unknown recipient in which he stated, "[U] kn I gotta handle this lil bih." At trial, one of the detectives interpreted this message to mean "[Y]ou know, I got to handle this little bitch." Data extracted from Haynes's cell phone also revealed his movement prior to his arrival at Walker's home that evening. It showed that on April 13 Haynes left his home in Plano and traveled to Dallas where Hill, his former co-worker, lived. From there he drove to Arlington, where Walker lived. Andrew placed Haynes in Walker's bedroom later that evening.

According to Andrew, sometime around midnight, he woke up in his downstairs bedroom and went upstairs to Walker's room where he found both Walker and Haynes awake in Walker's bed. When he tried to climb onto the bed and get between them, Walker instructed Andrew to either lie on the couch in her bedroom or to go back to his room. Andrew initially chose the couch, upon which a

---

[4]At one point, Walker confided in a text to one of her friends that she did not want to live with Haynes: "No ma'am. Not trying to live with anyone else. I've told him you don't have to live with me to coparent."

heavy blue backpack—that did not belong to either him or to his mother—had been placed. After removing the backpack and briefly lying down on the couch, Andrew returned to his room and fell back to sleep.

A few hours later, Andrew went back to his mother's bedroom, this time because he did not feel well. Again, he saw Haynes in bed with her. They were both sleeping, but Andrew woke Walker up. After checking Andrew's temperature, Walker sent him back to his room, where he fell asleep again.

Around 4:30 a.m., Haynes received a text message suggesting that the sender wanted him to return a gun: "Aye bro where you at I running late and I don't go no where without my gun." Haynes replied about 20 minutes later, apologizing and explaining that he had fallen asleep.

And at some point in the middle of the night, Howerton, Walker's neighbor, was awakened by a "big bang."[5] Howerton described it as sounding "like maybe a gunshot or . . . something maybe hitting a wall." But after waiting a few minutes and hearing nothing else, she went back to bed.

Based on text message activity on Haynes's phone, the police were able to determine that Hayne's phone was near Walker's residence until at least 6:06 on the morning of the murders. But for approximately the next three hours, no activity occurred on Haynes's cell phone from which the police could determine his location.

_____

[5]Howerton's and Walker's townhomes shared a common wall.

However, the police were able to determine that by 9:30 that morning Haynes's cell phone was near his residence back in Plano.

Andrew woke up that morning around 10:00 and went to his mother's bedroom. When he entered the bedroom, he noticed that the heavy blue backpack was gone and that his mother was still in bed with the covers on. Because she normally was up by 8:00 a.m., Andrew thought it odd that she was still in bed. He approached his mother's bed and tried to awaken her to no avail, and when he pulled the covers back, he saw her bloody body and the hole in her head.

Andrew immediately looked for his mother's cell phone so that he could call the police, but even though Walker normally slept with her cell phone, Andrew could not find it.[6] He then ran to Howerton's townhome, and she called 911.

When the police arrived, they saw no evidence of forced entry into Walker's home, and the detective who later investigated the murder testified that the absence of evidence of forced entry indicated that Walker knew the shooter.

Andrew was taken to the police station where he told the police that "Moosie" had been at the house that night. A family friend who had gone to the police station to pick up Andrew identified Haynes as "Moosie."

Later that afternoon, Haynes met with detectives, confirmed that his nickname was "Moosie," and agreed to be interviewed. During his interview, Haynes

---

[6]While he was searching for the phone, Andrew noticed a shell casing on the floor.

9

maintained his innocence and insisted that Walker had been dating some "white guy." A detective testified that he was not able to substantiate Haynes's claims about a "white guy" because Walker's family and friends said that she never mentioned having a relationship with anyone other than Haynes.[7]

Haynes also gave consent to the police to search his apartment. In the apartment, the police found a blue backpack.

Sometime after that, detectives visited Hill, and after learning that he owned a Glock, they took possession of it. Detectives later learned that the shell casing recovered from Walker's home matched a known sample fired from Hill's Glock. Swabs were also taken from the Glock and were tested against Haynes's DNA, but Haynes was excluded as a contributor.[8] Despite a lack of Haynes's DNA on the Glock, the lead detective stated that he did not change his investigation; Haynes was eventually arrested and charged with capital murder.

On appeal, Haynes argues that the evidence was speculative and insufficient to show that he was the shooter, for two reasons. We address these two arguments separately.

---

[7]Shiniqwa Walker, Walker's cousin, testified that she did not know anything about Walker's dating a "white guy." Lang, Walker's lifelong friend, testified that Walker never talked about being in a relationship with anyone other than Haynes. Valencia Turner, also one of Walker's friends, similarly testified that Walker never mentioned being in a relationship with a "white guy."

[8]DNA did confirm that Haynes was Baby Walker's father.

First, Haynes argues that the evidence is not clear as to when he was seen at Walker's residence and when the shooting occurred. Haynes is correct that neither his presence at Walker's residence nor the shooting were pinpointed as to a specific time. But the evidence did show that Andrew last saw his mother alive in the early morning hours of April 14 with Haynes sleeping in her bed. Then at 10:00 a.m., Andrew discovered that his mother was dead in her bed. If Andrew's testimony is to be believed, the shooting occurred sometime on April 14 between the early morning hours and 10:00 a.m. And cell phone tracking evidence placed Haynes near Walker's townhouse from midnight until at least 6:06 a.m. Howerton's testimony that she had been awakened in the middle of the night by a bang was consistent with the shooting having occurred before Haynes left Walker's townhouse at around 6:06 a.m.

While Haynes suggests someone else could have committed the murders between 6:00 and 10:00 a.m, a rational factfinder could have found that Haynes was present in the townhome at the time the shooting occurred. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

Second, Haynes points out that the handgun used to kill Walker belonged to someone else, and that Haynes's DNA was not found on the handgun. Thus, Haynes postulates, the case against him was speculative. But while it is undisputed that the pistol belonged to Hill and that Haynes's DNA was not found on it, the evidence against Haynes did not end there, and the rest of the evidence advances the proof beyond the realm of mere speculation.

11

For example, the evidence suggests a reasonable explanation as to how Hill's pistol ended up in Walker's residence. By tracing Haynes's cell phone, the police were able to determine that Haynes had traveled to Hill's apartment in Dallas before proceeding to Walker's townhouse in Arlington. Somehow Hill's gun ended up at Walker's residence, yet nothing suggested that Hill had been in Arlington on the night of the murders. Although circumstantial, a reasonable inference from the evidence is that Haynes brought Hill's gun from Dallas to Arlington.

Had Haynes's DNA appeared on the pistol, that would have helped the State's case, but the absence of his DNA on the gun did not necessarily weaken it. *See Barker v. State*, No. 12-07-00200-CR, 2008 WL 5339935, at *3 (Tex. App.—Tyler Dec. 23, 2008, no pet.) (mem. op., not designated for publication) ("It is true that the absence of DNA evidence linking Appellant to the complaining witness does not enhance the State's case. But it does not diminish the State's proof in the context of this case."). Similarly, the absence of DNA evidence does not necessarily make the State's case speculative. *See Herrera v. State*, 666 S.W.3d 841, 844 (Tex. App.—Tyler 2023, no pet.) ("Appellant argues that the evidence is merely speculative because his fingerprints and DNA profile were not found on the skimmer or the pump and the circumstantial evidence does not support a reasonable inference that he endeavored to intercept electronic communications. We disagree."). While the evidence against Haynes was circumstantial, the cumulative force of that evidence pointed to Haynes and only Haynes. *See Braughton*, 569 S.W.3d at 608 (stating that appellate courts determine

12

whether the necessary inferences made by the trier of fact are reasonable based upon the cumulative force of all the evidence). A rational factfinder could have found that Haynes used Hill's Glock to kill Walker and Baby Walker. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

We overrule Haynes's first issue.

**B. Selection of Alternate Jurors**

In Haynes's second issue, he argues that the trial court erred by preventing him from effectively exercising his peremptory challenge to an alternate juror. *See* Tex. Code Crim. Proc. Ann. art. 35.15(d). The record, however, does not show that Haynes objected to the manner of selecting the alternate jurors, does not show that he objected to the alternate jurors selected, and does not show that he objected to the jury panel as a whole. Haynes raises this complaint for the first time on appeal.

To preserve an alleged error for appellate review, a party must make a timely request, objection, or motion and state the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make it aware of the complaint, unless the context makes the specific grounds apparent. Tex. R. App. P. 33.1(a)(1); *see McDonald v. State*, No. 10-19-00067-CR, 2020 WL 103682, at *1 (Tex. App.—Waco Jan. 8, 2020, pet. ref'd) (mem. op., not designated for publication). Because the record does not show that Haynes objected to the manner

13

in which the alternate jurors were selected, Haynes has not preserved his complaint for appellate review.[9] *See* Tex. R. App. P. 33.1(a)(1); *McDonald*, 2020 WL 103682 at *1.

We thus overrule Haynes's second issue.

## C. Admission of Photographs

In Haynes's third and fourth issues, he complains about the trial court's admitting two photographs over his Rule 403 objection that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. In issue three, he argues that the trial court abused its discretion by admitting State's Exhibit 117, a photograph of the entrance wound behind Walker's ear, and in issue four, he maintains that the trial court abused its discretion by admitting State's Exhibit 133, a photograph of Walker in her bloodied pajamas with

---

[9]In Haynes's brief, he hints that trial counsel's failure to object might have deprived him of the effective assistance of counsel. Even though Haynes did not raise an ineffective-assistance-of-counsel claim in his motion for new trial, this claim may be raised for the first time on appeal. *Spielbauer v. State*, 634 S.W.3d 962, 967 n.2 (Tex. App.—Amarillo 2021, no pet.) (op. on remand). But even assuming that Haynes is raising an ineffective-assistance-of-counsel claim, "[a]n appellate court should not denounce counsel as being ineffective without counsel having had the opportunity to explain their trial strategy." *Id.* at 967. Having not raised this issue in the trial court or by way of motion for new trial, Haynes has not provided trial counsel such an opportunity, nor has Haynes shown that trial counsel's performance—even assuming that it was deficient—prejudiced him in any way. *See Walker v. State*, 676 S.W.3d 213, 220–22 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd).

14

her one visible arm and hand bagged to protect them from contamination after her body was removed from her bed.

### 1. Standard of Review

We review a trial court's ruling admitting evidence over a Rule 403 objection for an abuse of discretion. *Perez v. State*, 562 S.W.3d 676, 689 (Tex. App.—Fort Worth 2018, pet. ref'd). Provided the trial court's ruling falls within the zone of reasonable disagreement, no abuse of discretion occurs. *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009).

### 2. Legal Principles

When analyzing a Rule 403 objection, the trial court must engage in a balancing process. *Upchurch v. State*, 656 S.W.3d 170, 178 (Tex. App.—Fort Worth 2022, no pet.). The court must consider (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence and balance those factors against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Id.*; *see Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Newhouse v. State*, No. 02-23-00265-CR, 2024 WL 3819307, at

15

*3 (Tex. App.—Fort Worth Aug. 15, 2024, pet. ref'd) (mem. op., not designated for publication).

"Unfair prejudice" refers to the tendency to suggest a decision based on an improper basis, commonly, though not necessarily, an emotional one. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). Evidence might be unfairly prejudicial if, for example, it incites the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence. *Casey v. State*, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007).

In the context of admitting photographs of a corpse, courts should consider the number[10] and size of the photographs, whether they are in color or black and white and the detail shown, whether they are gruesome, whether the body is naked or clothed,[11] and whether the body has been altered since the crime[12] in some way that might enhance the gruesomeness of the photograph to the appellant's detriment. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006).

---

[10]On appeal, Haynes makes no complaint about the number of photos that were admitted into evidence.

[11]Walker does not appear naked or unclothed in either of the photographs that Haynes complains of on appeal.

[12]In State's Exhibit 133—the second photograph that Haynes complains about in his fourth issue—Walker's body was altered from the position in which it was found.

Generally, a photograph is admissible if testimony as to matters depicted in the photograph is also admissible. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). A trial court does not err merely because it admits into evidence photographs that are gruesome. *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995).

### 3. Application

#### a. Complaints Common to Both Photographs—Size, Color, and Gruesomeness

Regarding the size of the photographs, at trial, Haynes first objected to the photographs being displayed "across the screen in the courtroom." But after the State assured the court that it had no intention of displaying the photographs on "the big screen," Haynes voiced no complaint regarding the photographs' size. Likewise, on appeal Haynes takes no issue with regard to the size of the two photographs.

Regarding color, both photographs are in color, and Haynes contends that black-and-white photographs would have been less gruesome. While black-and-white photographs might have been less gruesome, they might also have been less illustrative because a black-and-white photograph would not distinguish between red and black—blood and shadow. The blood depicted on the color photographs provided visual support for the testimony from Dr. Susan Rowe, the doctor who performed the autopsy. Dr. Rowe testified that the bullet perforated Walker's carotid artery near the brainstem, went through her tongue, and exited through her mandible. And she explained that once the carotid artery, which was under high blood pressure,

17

was severed, the severance would cause rapid bleeding, produce "a lot of blood," and quickly become fatal.

These color photographs enabled the jury to see the blood that she described and thus evaluate the veracity of Dr. Rowe's testimony. And because there is nothing in this record to suggest that the jury would have given these photographs undue weight, the trial court did not abuse its discretion by allowing these color, as opposed to black-and-white, photographs into evidence. *See Mosley v. State*, 643 S.W.2d 212, 220 (Tex. App.—Fort Worth 1982, no pet.) (rejecting argument that admitting color photographs if black-and-white photographs were available constituted an abuse of discretion).

Haynes also contends that the State had other less gruesome photographs in evidence and that the availability of those photographs to prove the State's case should be considered. *See Young v. State*, 283 S.W.3d 854, 874 (Tex. Crim. App. 2009). Generally speaking, the decision on how the State prosecutes a defendant is best left to prosecutors, as delegating that task to defendants would undermine the adversarial system. *See Hunter v. State*, 691 S.W.3d 247, 251 (Tex. App.—Dallas 2024, no pet.) (recognizing that our system is adversarial); *McFadden v. State*, No. 11-16-00221-CR, 2018 WL 4137594, at *4 (Tex. App.—Eastland Aug. 30, 2018, no pet.) (mem. op., not designated for publication) (criticizing conduct that would undermine our adversarial process). In any event, as we explain below, State's Exhibits 116 and 118—the other photographs that Haynes identified and about which Haynes does not complain on

18

appeal—are similar to the two photographs he challenges on appeal.[13]  But State's

Exhibits 117 and 133 are also different from States Exhibits 116 and 118 in that they

both provide additional detail that States Exhibits 116 and 118 do not.

### b.  State's Exhibit 117

State's Exhibit 117, a close-up photograph of the side of Walker's head, is

limited to a depiction of the entry wound and the immediately surrounding area—

basically, the bullet's entry point, Walker's ear, and her hairline.  State's Exhibit 117

was an important building block in the State's case with inherent probative force

because with State's Exhibit 117's admission, the jury could see photographic

evidence that Walker had been shot behind the ear as described, and the jury did not

have to rely solely on the credibility of any witness's statements to that effect.

*Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) ("We reject the

premise that visual evidence accompanying oral testimony is cumulative of the

testimony or that it is of insignificant probative value.  Visual evidence accompanying

testimony is most persuasive and often gives the fact finder a point of comparison

against which to test the credibility of a witness . . . .").

Haynes argues that State's Exhibit 117 was "overly gruesome" and the

depiction of Walker's wound "could have been illustrated to the jury through the

---

[13]At trial, State's Exhibit 116 was admitted for record purposes only and was excluded from the jury's consideration as duplicative of State's Exhibit 117.  State's Exhibit 118 was admitted over Haynes's objection that it was duplicative and too gruesome.

admission and display of State's [E]xhibit 116 which is a much less graphic and prejudicial photograph."[14] If, as Haynes contends, State's Exhibit 116 is less gruesome, it is only marginally so. Both are color photographs that provide a close-up view of Walkers wound. The essential difference between the two is that they were taken from somewhat different angles and State's Exhibit 117 provides a slightly closer view such that it more clearly shows the entry wound. As such, State's Exhibit 117 added clarity that State's Exhibit 116 did not provide. After reviewing the record as a whole, including the photographs, we cannot say that the trial court acted outside the zone of reasonable disagreement by not restricting the State's evidence related to the entry wound to State's Exhibit 116 and witness testimony. *See De La Paz*, 279 S.W.3d at 343–44.

### c. State's Exhibit 133

State's Exhibit 133 depicts Walker's bloody torso. The body in the photograph was altered in two ways: (1) Walker had been moved and repositioned on her back, instead remaining on her side as she was found at the scene, and (2) a paper bag had also been placed over her one visible arm and hand to protect them from

---

[14]The trial court ruled that State's Exhibits 116 and 117 were duplicative and gave the State the choice of one or the other, and the State chose State's Exhibit 117. State's Exhibit 117 was admitted for all purposes, and State's Exhibit 116 was admitted only for record purposes. For purposes of Haynes's argument, Haynes appears to be arguing that the trial court should not have given the State the choice between State's Exhibits 116 and 117, should have excluded State's Exhibit 117, and should have forced the State to proceed with State's Exhibit 116.

contamination. Neither alteration, however, enhanced any gruesomeness, and the alterations were explained to the jury.

As to Haynes contention that State's Exhibit 133 was "overly gruesome" and the depiction of Walker's bloody torso was "already illustrated to the jury through the admission and display of State's [E]xhibit 118 which is a much less graphic and prejudicial photograph," we disagree. State's Exhibit 118 was actually markedly more gruesome than State's Exhibit 133. State's Exhibit 133 does not show Walker's face but only the bloody torso area, whereas State's Exhibit 118—about which Haynes does not complain—implicates more trauma and pain with its depiction of Walker's clinched fist near her face and both of her nostrils oozing blood.

To the extent that Haynes argues that State's Exhibit 133 was cumulative of State's Exhibit 118, we also disagree. While they share similarities, State's Exhibit 133 illustrates one more essential fact that the State was required to prove, i.e., that Walker was pregnant. In State's Exhibit 133, her pregnancy is unmistakable, whereas in State's Exhibit 118 her pregnancy is barely noticeable. Rather than enhance the gruesomeness effect, State's Exhibit 133 allowed the jurors to see that which was not obvious in State's Exhibit 118. The fact that Walker was pregnant when she was shot and bled to death was directly relevant to proving that Baby Walker died as a result of his mother's bleeding to death. That State's Exhibit 133 was gruesome in content simply reflects the gruesome nature of the death of mother and child. It was prejudicial to Haynes, but not overly so. *See Shuffield*, 189 S.W.3d at 787–88 ("[T]hese

21

photographs show only the injuries that the victim received and are no more gruesome than would be expected.").

As with State's Exhibit 117, we cannot say that the trial court abused its discretion by not restricting the State's evidence to the facts depicted in State's Exhibit 118 and witness testimony. *See De La Paz*, 279 S.W.3d at 343–44.

### d. Ruling

Because we hold that the trial court did not abuse its discretion by admitting State's Exhibits 117 and 133, we overrule Haynes's third and fourth issues. *Upchurch*, 656 S.W.3d at 178.

## IV. Conclusion

Having overruled all four of Haynes's issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 19, 2025